**CLAUDE NEON LIGHTS, Inc., v. E. MACH-LETT & SON (two cases).**

District Court, E. D. New York. October 13, 1927.

Nos. 2465, 2749.

1. Patents ⬯328—Claude patent, 1,125,476, for system of illumination, held valid, but as limited by prior art not infringed.

Claude patent, No. 1,125,476, for system of illiminating by luminescent tubes, *held* valid, but, as limited by the prior art, not infringed.

2. Patents ⬯328—Claude patent, 1,191,495, for method of separating neon from gases with which it is mixed, held invalid.

Claude patent, No. 1,191,495, for method of separating neon from gases with which it is mixed, *held* invalid as an attempt to patent the functioning of an old device, and if conceded validity, *held* not infringed.

In Equity. Suits by Claude Neon Lights, Inc., against E. Machlett & Son. Decrees for defendant.

Bohleber & Ledbetter, of New York City (Edwin J. Prindle and William Bohleber, both of New York City, of counsel), for plaintiff.

Darby & Darby, of New York City (Samuel E. Darby, Jr., and William G. McKnight, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge. The two above-entitled suits, for the alleged infringement of two patents, have been consolidated and tried together by consent of the parties.

The first above-entitled suit is based upon patent No. 1,125,476, issued by the United States Patent Office to Georges Claude, for "system of illuminating by luminescent tubes," dated January 19, 1915, the effective date of invention being November 28, 1910, the date of the filing of the corresponding French patent No. 434,525.

The second above-entitled suit is based upon patent No. 1,191,495, issued by the United States Patent Office to Georges Claude, for "method for separating neon from gases with which it is mixed," dated July 18, 1916, the effective date of invention being June 24, 1912, the date of the filing of the corresponding French patent No. 456,694.

Both of these patents were duly assigned by Georges Claude to the plaintiff, of which he is a stockholder.

The bill in each suit prays for an injunction, accounting of profits, and damages.

The defendant has interposed the defenses of invalidity and noninfringement in each suit.

On the trial, it was conceded that the defense was conducted and controlled by the Rainbow Light, Inc., and that the operations of E. Machlett & Son, complained of as an infringement, were carried on by them for it.

The books, articles, catalogues, photographs, patents, and tubes, introduced to show the prior state of the art, anticipation, and prior uses, were numerous, and it does not seem necessary to analyze each of them; although all of them had my serious consideration.

For the sake of convenience I will consider the patents in suit in their order.

## Patent No. 1,125,476.

[1] In the first patent in suit, No. 1,125,476, there are two claims, both of which the plaintiff contends the defendant infringed. Claim 1 reads as follows:

"A luminescent tube containing previously purified neon and provided with internal electrodes for illuminating said gas, said electrodes being deprived of occluded gases and having an area exceeding 1.5 square decimeters per ampere, to decrease the vaporization of the electrodes and prevent the consequent formation upon the walls of the tube, in proximity to said electrodes, of deposits containing said gas, whereby the luminosity of the tube is maintained constant for a very considerable period of time without a fresh introduction of gas."

Claim 2 differs from claim 1 only in that it contains the additional provision with reference to the electrodes, "and being supported without direct contact with the walls of the tube."

The preferred method of accomplishing this result, as shown in the specifications, is by means of two collars of glass beads *i*.

From the specification and claims of the patent in suit, it is apparent that what the petitioner was seeking to obtain was a Geissler tube using previously purified neon gas, which without the introduction thereafter of fresh gas would maintain constant its luminosity for a considerable period of time.

The period of time in question was undoubtedly more than 1,000 hours, because that represents the average length of the life of an electric bulb with which the tube in question would be compelled to compete.

At the outset it is well to recall that Claude did not discover neon gas; on the contrary, neon gas was discovered, in 1898, by Ramsey and Traverse, and its various characteristics were all well known prior to any date with which we are concerned.

Claude, by an invention of his, was able to produce neon gas at a reasonable cost, whereas before that invention the cost of neon gas was so high as to make it impossible to use it commercially. For that invention he is entitled to the highest credit, but the production of neon gas was not the invention of the patent in suit.

Knowing, as we do, what Claude was seeking to obtain, the first question to be determined is What was the invention of the patent in suit?

The tube shown in the patent in suit is not new, but is a Geissler tube, consisting of a glass vessel comprising two enlarged ends, connected together with a portion of smaller diameter, in each of which ends is inclosed an electrode, the tube evacuated, and gas being the sole medium between the electrodes.

Such tubes were well known in the art for many years before any date with which we are concerned, and many kinds of gas, both of the active, common, or diatomic gas group, including nitrogen, hydrogen, oxygen, carbon monoxide, and carbon dioxide, and of the rare inert or monatomic group, including neon, helium, argon, and krypton, but not xenon, had been described as the gaseous medium, but, on the passage of an electric current through the gas, each had its own characteristic color. See United States patents to Beck, No. 452,514, to Bohn, No. 524,752, to Kilmer, No. 582,649, and to Moore, No. 699,208, testimony of Dr. Nutting, Fleming article, Butler & Burke British patent, No. 13,084, of 1905, Hewitt patent, No. 814,696, Hewitt patent, No. 900,733, Claude French patent, No. 424,190, and the corresponding Claude United States patent, No. 1,131,190.

From the patent itself it is obvious that Claude believed that all prior Geissler tubes were short lived, but, without conceding the correctness of that belief, let us see what he stated was the cause, because it was the discovery of a way to lengthen this life, so as to compete with the electric bulb, that must have constituted his invention.

He ascribed that short life to the electrodes being too small, and being heated enormously on the passage of the current, owing to the considerable drop in potential which occurs at the electrodes, causing them to disintegrate, or, as it is called, volatilize, vaporize, or sputter, and particles thereof to fly from the electrodes and form a film or coating on the glass surrounding them, which film or coating would absorb or entrap the molecules of gas within the tube, reduce the pressure, and dissipate or use up the gas to an extent that there would not be sufficient remaining to conduct the current from one electrode to another.

This was not a discovery of Claude's, although inferentially, if not actually, he seems to so contend in the specification. On the contrary, it was well known to the art that at a given pressure of gas, when current at a low value flows through the tube, a cathode glow occurs at the electrode. With a gradual increase of current, this glow proceeds to a corresponding extent over the electrode until a point is reached when, with the given pressure, a certain value of current causes the glow to expand over and encompass the entire surface of the electrode. The cathode drop—i. e., the difference in potential between the end of the electrode and the end of Crooke's dark space, immediately adjacent thereto—stays constant, and is practically negligible up to this point, being less than is necessary to cause undue volatilization, vaporization, sputtering, or disintegration of the electrodes. This is called the normal cathode drop in potential. Should the current continue to increase beyond that point, the cathode drop becomes immediately enormously increased, and the difference in potential means a loss of electrical energy, which does not merely disappear, but dissipates itself in the form of heat accompanied with a physical phenomena which is similar to impact, and it is the combination of heat and impact so caused that causes the electrode to disintegrate.

As a remedy for this, Claude suggested in his specification of the patent in suit, "if the surface of the electrode is sufficiently large for the heating to be small, the vaporization is smaller, and the disappearance of the neon is very slow, and a very long life of the tube may be obtained by this method."

From the specification it would appear that Claude erroneously thought this was his discovery, and he also thought that in this respect he had discovered that neon behaved in a different manner from other gases. In this I think he was in error.

The only difference between neon and helium is the difference that exists in their inherent characteristics; both are inert, rare gases of the atmosphere, with different characteristic color in their spectrum.

I hold with the Examiner of the Patent Office, "French patent No. 346,487 points out the desirability of providing a helium lamp with large electrodes, and British patent No. 4098, of 1910, points out the equivalence of neon and helium." See, also, Defendant's Exhibit D, Bulletin No. 89, Bureau of Standards, December, 1907, No. 13, Baly's

paper, "The Spectra of Neon, Krypton, and Xenon," 1903, No. 27, Thompson's book, Conduction of Electricity Through Gases (1906 Ed.) p. 547, Defendant's Exhibit G, "Pseudo High Vacua," by Soddy & Mackenzie, Defendant's Exhibit D, No. 26.

By amendment of his claims after rejection from "rare gases of the atmosphere" to "neon," regardless of whether such amendment was required, the patentee limited his patent to neon as the medium between the electrodes, and also limited each claim by inserting "being deprived of occluded gases and" after "electrodes."

It seems to me that the only disclosures of the patent in suit over those of patent No. 1,131,910, issued by the United States Patent Office to Georges Claude, dated March 16, 1915, on application filed February 27, 1911, are a different specific method of purifying the neon, depriving the electrodes of their occluded gases, and a definite area for the electrodes.

In my opinion the spectral tubes are an analogous art, they are luminescent tubes, and that is what is described in each claim of the patent in suit, "a luminescent tube." They were not pure tubes, regardless of whether it was possible to make them pure.

There is no limitation of the patent in suit to signs, but it is for a "system of illumination by luminescent tubes" to be used for any purpose.

I am convinced that the plaintiff's expert was in error in his claim of a capillary phenomenon restricted to spectral tubes, and that the only difference between a spectral tube and a lighting tube is in degree or size.

Claude claimed as his invention—previously purified neon; electrodes deprived of their occluded gases; electrodes having a surface area exceeding the critical area of 1.5 square decimeters per ampere to prevent vaporization.

These are necessary elements, and, although the prior art shows that the advantage of obtaining pure neon was known, as also the depriving of the electrodes of their occluded gases, and that large electrodes were preferable to small ones, all of these elements are not shown in any illuminating tube using a gaseous conductor which had a life long enough for practical purposes without refilling, which is in evidence or described in any publication in evidence, nor are they all claimed in any patent in evidence, and Claude's rule of relationship between current and electrode area is not specifically disclosed in any prior patent or publication.

In so deciding I have not overlooked any of defendant's evidence, especially the tubes forming names of gases constructed by the Bureau of Standards, which in my opinion were shown to have antedated the date of invention of the patent in suit, nor the Goetze catalogue which, in my opinion, was properly admitted in evidence; but, by the combination which Claude claimed as his invention, he produced an effective system of illumination, as distinguished from an experimental tube or light.

The plaintiff cannot broadly claim invention in the statement of the rule of relationship between current and electrode area, because, while no fixed rule had been stated, the electrodes of the tubes of the Bureau of Standards, and of the spectral tubes generally, had a surface area exceeding the critical area of 1.5 square decimeters per ampere, for the same purpose as stated in the patent in suit; but the plaintiff can claim invention in the stated rule of relationship, when found in combination with neon previously purified, and the electrodes deprived of their occluded gases, as claimed in the patent in suit.

Defendant says that the rule is incorrect, but the patent in suit carries the presumption of validity, and the burden is on the defendant to show that to be a fact.

I am not satisfied that defendant has borne that burden, because it does not seem to me that the series of tests made by the defendant's witnesses, relying on the optical appearance of the cathode glow to indicate when the cathode drop had become abnormal, or the other method used by them of inserting a thermometer in a teal or thimble formed in the wall of the tube, the thermometer being exterior to the tube and not touching the electrode, were reliable enough to warrant me in finding that plaintiff's rule is incorrect.

The button electrode which defendant claims it is now using was not considered by me on the question of infringement, because no such electrode was used in the tubes which were alleged to infringe, nor do I think it is evidence that Claude's rule of relationship between current and electrode is incorrect, because from Mr. Machlett's testimony it appears that the result cannot be obtained with the button electrode alone, but only in connection with the caesium mirror; therefore it may well be, but I do not so decide, that Mr. Machlett, in the use of the smaller electrode and the caesium mirror, has discovered a new article, and the rule of the patent in suit is correct when caesium is not used.

Defendant contends that the only controlling factor in the life of the tube is the

degree of pressure of the gas employed, and that this fact is not disclosed in the patent in suit, but, on the contrary, the disclosure of the patent in suit is inconsistent therewith.

In my opinion defendant did not sustain this contention, because the life of the tube may be lengthened by increasing the length of the tube, thus obtaining more gas, and also because with the ordinary working pressures of between two millimeters and eight millimeters it does not make much difference on the critical value of the area of the electrode, 1.5 square decimeters per ampere.

The patent discloses that the pressure of neon in the tube may be of the nature of a millimeter of mercury, and it is a scientific fact that the degree of pressure at which neon is most conductive is of the order of one millimeter of mercury.

I therefore cannot find that the patent is inoperative, because length of life may be obtained by the sacrifice of efficiency, and this is what both plaintiff and defendant are doing.

The fourth defense, that the patent in suit is invalid because it was not filed within one year of the filing of the corresponding application in France was not sustained.

The certified copies from the Patent Office all show that the application was filed November 9, 1911, while the date of the filing of the application was November 28, 1910.

There was a clear compliance with section 4887 Revised Statutes (35 USCA § 32 [Comp. St. § 9431]), and the filing date of the papers in the Patent Office is shown by the date indorsed on the papers, and not by the letter in evidence which states, "This application must be completed on or before November 28, 1911."

On the question of infringement, plaintiff contends that the question of infringement is whether defendant's tube, when completed, infringes claims 1 or 2 of the patent in suit, and that it is immaterial to that question how the tube was manufactured.

That contention cannot be broadly sustained, because, if it is true, then any one who constructs a luminescent tube containing electrodes with neon gas as the medium, which in script makes a letter or spells a word, infringes, and the tubes made by the Bureau of Standards, as well as many of the spectral tubes in evidence or described in published works, would, if later, infringe, but as they were earlier than the patent in suit, they would anticipate; which I have held they did not.

The patent in each claim calls for tubes containing previously purified neon and electrodes which have been deprived of their occluded gases, and in the specification recited:

"Consequently, * * * it is necessary to employ an exceedingly efficacious purification process on the spot in order to attain a high degree of purity of the neon which fills the tubes notwithstanding the liberation of the gases occluded in the walls or in the electrodes during the 'formation' of the said tubes."

And if the plaintiff's expert was correct, then the neon must have been purified and the electrodes deprived of their occluded gases during the manufacture of the tube.

Even if the alleged infringing tubes contain electrodes having an area exceeding 1.5 square decimeters per ampere, that alone does not sustain the charge of infringement, because, in addition, the burden is on the plaintiff to show that they contain previously purified neon, and electrodes which have been deprived of their occluded gases.

The burden of proving infringement is upon the plaintiff, and that burden never shifts.

Plaintiff called as its witness Kapetyn, who was not an employee of the defendant but of the Rainbow Light, Inc., and he testified as to the manufacture of the two alleged infringing tubes, as follows:

"After the glass tubing had been bent to form the letters, and after the electrodes had been attached, the sign was attached to a mercury vapor pump, the air was removed from the tube, and, after the air had been removed, the pump was closed, and the neon gas was admitted, and then the tube was sealed off."

Whether the words of both claims "previously purified neon" mean neon which has been purified before being introduced into the tube, or purified before the construction of the tube is completed, it certainly does not describe commercial neon gas that may have become purified by use or aging, due to its own peculiar characteristics, without the use of the means of purification described in the patent in suit.

If it had such meaning, then every prior electrical discharge tube acted in the same way, and the patentee was attempting to patent a function, or the operation of all electric discharge tubes, which could not be sustained.

Electrodes deprived of occluded gases, as described in the patent in suit, mean, according to plaintiff's witnesses, electrodes which have been heated up to 900 to 1,000 degrees C.

21 F.(2d)—54

Glass can be deprived of its occluded gases at a temperature between 280 and 300 degrees C. The heating of electrodes to 200 degrees C, cannot deprive the electrodes of occluded gases, and this seems to have been the limit of heat to which the electrodes of the alleged infringing signs were subjected before being placed in use.

Both in the specification of the patent in suit and in the testimony of the plaintiff's expert, the importance of pure neon is made plain; in fact, one of the distinguishing differences in the claims of the patent in suit over the claims of United States patent No. 1,131,910, issued to Georges Claude, is that each claim of the patent in suit calls for "previously purified neon," while each claim of patent No. 1,131,910 calls for approximately pure neon.

While the advantages of a pure gas were known before any 'date of invention with which we are concerned, and while Dewar had taught the use of charcoal in the purifying of gas, he did not teach the specific method of purifying neon which is disclosed in the patent in suit.

The patent in suit is not a pioneer patent, but is for an improvement over the helium and other lights of the prior art, and there is no infringement unless the three elements, viz. previously purified neon, electrodes deprived of their occluded gases, and electrodes having a surface area exceeding the critical area of 1.5 square decimeters per ampere to prevent vaporization, which the patentee claimed as the invention of the patent in suit, are found in the alleged infringing signs.

From the testimony of the only witness produced by the plaintiff as to the alleged infringement, which was the manufacture, not the sale, of the signs, it is clear that the alleged infringing signs did not contain the previously purified neon of the patent in suit, nor were the electrodes of the alleged infringing signs deprived of occluded gases, both of which are essential elements of the patent in suit.

Mr. Machlett was not at the factory when the alleged infringing signs were manufactured, and therefore he was unable to testify as to the use of magnesium carbonate in these signs.

Under the circumstances I see no necessity for considering the effect of the use of magnesium carbonate, as it is not shown that it was used in the alleged infringing signs with which, in this suit, this court is alone concerned.

To me it seems clear that signs made as the plaintiff's witness Kapetyn testified the alleged infringing signs were made are not the signs of the patent in suit, and do not infringe. In fact, neither plaintiff, in its commercial structure, nor the defendant in the alleged infringing signs, followed the teachings of the patent in suit, and the defendant in particular followed the teaching of the prior art.

The first patent in suit, limited as I have found it to be, is valid but not infringed.

### Patent No. 1,191,495.

[2] Although under plaintiff's bill its suit was based on the five claims of the above-numbered, the second patent in suit, on the trial it elected to rely only on claim 2, which reads as follows:

"2. The method of obtaining neon purified from nitrogen, oxygen, helium, etc., in a closed receptacle containing electrodes having a surface large enough to practically avoid absorption of neon during operation, which comprises establishing within the receptacle a highly rarefied atmosphere containing neon, and passing an electric discharge between the electrodes, said discharge being continued until the impurities have been removed from the neon to such an extent that they will be practically invisible in the spectrum obtainable from the residual gas."

The patentee in the first paragraph of the specification of this patent says:

"It has been found that if a closed vessel provided with electrodes of carbon or of a metal such as iron, copper, etc., contains rarefied gases such as nitrogen, oxygen, helium, etc., the said gases are absorbed comparatively quickly if a prolonged electric discharge is caused to pass between the electrodes. I have found, however, that, by way of exception, when the atmosphere of the inclosure is constituted by neon, the absorption of the said gas is considerably more slow, with the equal degree of rarefication, than in the other cases and the smaller, the greater the surface of the electrodes."

This constitutes the substance of the invention, if any, of the patent in suit.

The discovery of the principle of the action, and not the mere use of this step for separating neon, constituted invention. If the patentee had been the discoverer of the principle, then he disclosed everything found in the patent in suit in his application for the first patent in suit, No. 1,125,476, in the specification of which he said:

"Now, if neon behaves in such a different manner, it is due to the property, hitherto

unknown, of being absorbed to a remarkably less degree by the electrodes than all the other gases and especially helium."

Any tube made in accordance with the first patent in suit would inherently and unavoidably practice the alleged invention of this second patent in suit, and the first patent in suit is a complete anticipation.

However, Claude was not the discoverer of the principle. Nearly all the pure gases, whether active or inert, are selectively absorbable with respect to each other, and this was well known before any date with which we are concerned in the instant suit.

This clearly appears from the prior art. See Thompson's Book, Conduction of Electricity Through Gases (1906 Ed.) Defendant's Exhibit G, Travers' article, "Some Experiments on Helium," 1897; Defendant's Exhibit E, No. 3, and magazine article, "Concerning the Cathode Drop of Alkali Metals," 1902, No. 4, Travers' "Experimental Study of Gases," 1901, Defendant's Exhibit S, and especially with reference to neon, see Soddy & Mackenzie article, pages 99 and 100, Defendant's Exhibit D, No. 26, on which latter page, under a subheading, "For Behaviour of Neon and Argon," they say, "The results obtained with neon and argon were quite analogous to those recorded for helium."

Every vacuum discharge tube with internal electrodes, which was made prior to the alleged date of invention of the patent in suit, inevitably and inherently employed the alleged invention of the patent in suit and anticipated it.

What the patentee sought to do by the second patent in suit in 1913 was to patent as a process what inherently happened in the normal and intended operation of the 1911 Claude device, and in fact the normal and intended operation of any of the electric discharge tubes of the prior art having internal electrodes.

It did not show invention for the gas to gradually become pure by electrically exciting it, because that is exactly what would have happened in the normal and intended operation of any of the electric discharge tubes of the prior art.

What the patentee sought to patent in the second patent in suit was the functioning of an old device in its intended and normal manner, and the patent is invalid for want of patentable subject-matter. National Hollow B. B. Co. v. Interchangeable B. B. Co. (C. C. A.) 106 F. 708.

In any event, the plaintiff's witnesses pointed out that the electrodes had to be deprived of their occluded gases, in order to practice the invention of the second patent in suit, and, as I have found the plaintiff has failed to show that the electrodes of the alleged infringing signs were deprived of their occluded gases, there was no infringement.

The second patent in suit is invalid, but, even if it was valid, it was not infringed.

The motion to strike out the Goetze catalogue and other exhibits and testimony, made on behalf of the plaintiff at final hearing, is denied.

A decree may be entered in favor of the defendant, with costs.