## CLAUDE NEON LIGHTS, Inc., v. E. MACHLETT & SON et al.

Circuit Court of Appeals, Second Circuit. November 11, 1929.

On Rehearing, December 21, 1929.

No. 137.

Clarence E. Mehlhope, of Chicago, Ill., and Edwin J. Prindle and Bohleber & Ledbetter, all of New York City (Thomas Ewing

and William Bohleber, both of New York City, on the brief), for appellant.

Dean S. Edmonds and William H. Davis, both of New York City (Leslie B. Young, of New York City, on the brief), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge. This appeal is a sequel of the decision of this court upon another occasion [Claude Neon Lights v. E. Machlett & Son, 27 F.(2d) 702], in which the patent was held valid and infringed by the electrode there in suit. The general nature of the invention and its scope we then considered at length, and it is not necessary to repeat what we said. The supplemental bill was filed to bring within the claims another sort of electrode, whose infringement we then declined to consider. It consists of an iron cathode whose area is less than one half that of the minimum which the claims prescribe, and which nobody asserts would alone infringe. Indeed it would not be operative at all, except that the defendant supplements its action by depositing upon the walls of the tube near the cathode a thin layer, or "mirror," of cæsium, an alkaline metal. For some reason which is not altogether understood, when the current excites the neon a part of the cæsium vaporizes and invades it near the cathode, increasing the conductivity of either the gas in the "dark space," or the surface of the cathode. This necessarily decreases the fall in potential and prevents the cathode from vaporizing, imprisoning atoms of neon with its particles upon the walls of the tube and so exhausting the gas. The result is concededly the same in that the tube retains its luminosity, and this because the cathode is not disintegrated; the question is whether the cathode and "mirror" is the equivalent of a cathode whose area is 1.5 square decimeters for each ampere of current used.

The plaintiff recognizes that on any theory of equivalents, however broad, it must show that all the elements of the claim are embodied in the infringement, but it argues that the invention, broadly construed, is to avoid the occlusion of the gas through the vaporization of the cathode, which takes place only because of the cathode drop. That the reduction of this drop is the heart of the invention, and therefore although the cæsium mirror is another means of securing the result, it is substantially the same as that disclosed. That the defendant therefore necessarily uses the "invention," because Claude alone disclosed that anything which reduces the drop preserves the gas.

However far-reaching Claude's invention might have been, we should have some pause in holding that the claims could be stretched so far. The doctrine of equivalents, though well settled for many years, is anomalous, if the claim is measured only by its words, and for this reason we once went so far as to say that it means no more than that the language of claims shall be generously construed. Motion Pictures Co. v. Independent Co., 200 F. 411 (C. C. A. 2). Such a limitation is however irreconcilable with those extremely numerous decisions which have extended a claim to structures which by no possibility it could cover, judged by any tenable canons of documentary interpretation. Winans v. Denmead, 15 How. 330, 343, 14 L. Ed. 717; Blake v. Robertson, 94 U. S. 728, 24 L. Ed. 245; Clough v. Gilbert & B. Mfg. Co., 106 U. S. 166, 1 S. Ct. 188, 27 L. Ed. 134; Royer v. Schultz Belting Co., 135 U. S. 319, 10 S. Ct. 833, 34 L. Ed. 214; Hoyt v. Horne, 145 U. S. 302, 12 S. Ct. 922, 36 L. Ed. 713; Reece Button-Hole Mach. Co. v. Globe Button-Hole Mach. Co., 61 F. 958 (C. C. A. 1); McCormick Harvesting Mach. Co. v. C. Aultman & Co., 69 F. 371 (C. C. A. 6); McSherry Mfg. Co. v. Dowagiac Mfg. Co., 101 F. 716 (C. C. A. 6). In Winans v. Denmead, 15 How. 343, 14 L. Ed. 717 (1853), the Supreme Court, apparently for the first time, laid down the doctrine over a strong dissent, and based it upon the theory that the claim was not intended to be verbally definitive, but to cover the "invention" which should, to some extent anyway, be gathered from the disclosure at large.

It is plain that such latitude violates in theory the underlying and necessary principle that the disclosure is open to the public save as the claim forbids, and that it is the claim and that alone which measures the monopoly. Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 278, 24 L. Ed. 344; Yale Lock Co. v. Greenleaf, 117 U. S. 554, 559, 6 S. Ct. 846, 29 L. Ed. 952; White v. Dunbar, 119 U. S. 47, 52, 7 S. Ct. 72, 30 L. Ed. 303; McClain v. Ortmayer, 141 U. S. 419, 424, 12 S. Ct. 76, 35 L. Ed. 800; Minerals Separation v. Butte, etc., Co., 250 U. S. 336, 350, 39 S. Ct. 496, 63 L. Ed. 1019. The vacillation in the decisions is a necessary consequence of this inconsistency in theory, somewhat analogous to the similar inconsistency which pervades reissues and amendments. It is the claim which singles out from

the complex disclosed those elements which constitute the "invention," and substantially the whole work of the Patent Office lies in determining, not whether the disclosure is new because all of it never is, but whether the claims proposed are. Strictly the disclosure should be used therefore only as the setting of the claims and to find what the words employed really mean. Otherwise courts would have to assume the duties of the office afresh and compose such claims as the prior art might have allowed, had the patentee been foresighted enough to include all possible variants of his meaning. Such a result the decisions have repeatedly repudiated, and it would result in an intolerable burden upon the public, which would be charged not only with a knowledge of the prior art at the time of the application and often earlier, but with a right conclusion as to how much room was left for invention, seldom an easy question.

■ On the one hand, therefore, the claim is not to be taken at its face—however freely construed—but its elements may be treated as examples of a class which may be extended more or less broadly as the disclosure warrants, the prior art permits, and the originality of the discovery makes desirable. On the other, it is not to be ignored as a guide in ascertaining those elements of the disclosure which constitute the "invention," and without which there could be no patent at all. It is obviously impossible to set any theoretic limits to such a doctrine, which indeed its origin forbids, since it is in misericordiam to relieve those who have failed to express their complete meaning. Somewhat the same process is indeed inherent in the interpretation of any verbal expression, and perhaps the best that can be said is that in the case of patent claims much greater liberties are taken than would be allowed elsewhere. Each case is inevitably a matter of degree, as so often happens, and other decisions have little or no value. The usual ritual, which is so often repeated and which has so little meaning, that the same result must follow by substantially the same means, does not help much in application; it is no more than a way of stating the problem. Any decision is therefore bound to have an arbitrary color, as in all close cases of interpretation, and it is difficult to give it greater authority than an appeal to the sympathetic understanding of an impartial reader.

■ In the case at bar Claude did indeed disclose the operation of a current upon a cathode in a column of neon, and how it was eaten away and the atoms of the gas carried off with the disjecta to be imprisoned upon the walls of the tube. Apparently he supposed that he was the first to observe these phenomena, though in this he was mistaken, as we shall show. All that can by any stretch be thought not to have been expressly disclosed earlier, was that the cathode fall was due to the resistance of the cathode, which was assumed by all investigators. He appears to have assumed it also and its converse, that an increase of conductivity in the electrode would reduce the drop. He merely alludes to the drop twice in his specifications, once when he incidentally speaks of it as the cause of the heating, and again when he says that because of the superior conductivity of neon, the differences in potential at the terminals are much smaller than in the case of other gases. His invention he rested upon the whole range of events dependent upon the drop and his own way of remedying the resulting difficulties. He could in any event succeed only in case the art had not anticipated the main discovery; perhaps even then his claims would not suffer such expansion. They disclaimed any cathode whose area was less than that which he prescribed, and instead of leading others towards experiments with such, diverted them. It is difficult to see how practically they can be said to have taken what he reserved, even though his disclosure was the cue for their experiments. They were entitled to use it so, so long as they kept outside what he had chosen to appropriate.

Furthermore and quite independently, the disclosure emphasizes the necessity that the neon shall be pure, a requirement which pervades the whole, and was the basis of much of the argument by which he prevailed before, especially in distinguishing between spectral and commercial tubes. It is not disputed that in operation the cæsium vaporizes, for the mirror, qua mirror, has no part in the circuit. The defendant has here too abandoned the disclosure by the deliberate introduction of an "impurity," which in some curious way hangs about the cathode and does not infect the positive column at all.

However, all this aside, Claude was not the first to learn of the effect of an electric discharge in a rarified atmosphere of neon. In 1896 Travers discovered that helium, a monatomic and therefore an inert gas, was absorbed when used in such a tube with platinum electrodes, and he inferred that it was carried off with particles of the platinum, "sparked on to the walls of the tube." His experiments covered not only helium, nitro-

gen and carbon compounds, but argon, another monatomic gas, and while he found that this last was absorbed only in small degree, others had absorbed nearly all of it. In 1901 Willows noted the disappearance of hydrogen, nitrogen and air accompanied by "sputtering" of aluminium electrodes. His explanation proved to be incorrect, as he thought that there was a chemical union of the gas with the walls of the tube, because the gas disappears when external electrodes are used; but his observation was correct.

In 1903, Sir J. J. Thomson treated the whole subject in the light of what was then known, in a work entitled "Conduction of Electricity Through Gases," of which a second edition appeared in 1906. In the case of all such tubes the gas divides so that by far the greater part is the "positive column," which in commercial tubes constitutes the illuminent. Close to the cathode however is "Crookes dark space," followed by the "negative glow" which is in turn succeeded by "Faraday's dark space," not important here. "The electric force is very large indeed in the Crookes dark space, diminishes rapidly towards the negative glow and in the negative glow it is very small" (§ 228). The difference in potential between the cathode and the glow, "the cathode fall," is independent of the current until the glow completely surrounds the cathode when it responds to its changes (§ 229). (Some of the experiments included helium and argon.) "When the discharge passes through the tube portions of metal shoot out normally from the cathode and form a thin metallic film on the walls of the tube." The extent of this depends "on the nature of the gas; thus there is very little disintegration of aluminium electrodes in air, but a large amount in the monatomic gases, helium, argon and mercury vapor. * * * Grandquist found also that the loss in weight in a given time is proportional to the square of the current when the pressure is constant" (§ 237). The cause of this disintegration was not then fully understood; possibly it was due to the bombardment of ions "which have fallen through a potential equal to the cathode drop" (§ 238).

In the same year when Thomson's work appeared Baly, who was working with neon among other gases, found that aluminium electrodes would "splash" upon the sides of the tube and that the particles so struck off carried with them atoms of the gas which exhausted the rarified atmosphere so that it had to be renewed. Moreover, he found that the electrodes contained hydrogen which would be emitted so as to mask the spectrum in the tube. To remedy this he subjected the electrodes to initial heating to drive off the occluded gas. Nutting in 1905 concluded that vaporization was due "to the great loss of energy in the electrode fall of potential at the surface," perhaps because the current heats the metal, but more probably because the current tears away the surface. In any event the vaporization is proportional to the fall in energy, which being the product of current and electrode fall—itself proportional to the current—makes the vaporization proportional to the square of the current, just as Grandquist had concluded.

Thomson in the later edition of his book said that the gases occluded in electrodes will first be driven off at a much lower cathode fall than that necessary to break up the cathode proper, something akin to Baly's discovery. He describes the absorption of the gas which was "very considerable," and which "cannot wholly be due to absorption by the electrodes" (§ 270). Whether this meant through occlusion by the particles thrown off does not certainly appear, but presumably it did.

Campbell-Swinton in 1907 exhaustively examined the effect on the walls of the tube of the atoms striking against them and demonstrated that some of them were mechanically driven into the glass, but he was in doubt whether any part was occluded by the deposit of disintegrated particles of the cathode. He used helium. In 1908 after renewed experiments he found that "the occlusion may take place largely in such deposit." Between his two papers Soddy and Mackenzie in 1907 experimented principally with helium, but also with neon with which the results were "quite analogous." They determined the point of exhaustion at which gas ceased to conduct, and that "the absorption of helium, argon and neon in spectrum tubes after continuous running occurs mainly in the volatilized film of aluminium deposit from the electrodes. * * * The portion causing the Campbell-Swinton effect is only a small fraction of the total."

All these investigators used spectrum tubes, fitted only for research and to examine the spectrum of gases. They are quite different from commercial tubes and we declined in our first decision to treat them as anticipations. The spectrum of the gas was recognizable even though it was impure and upon the issue of "impurity" they were not relevant. But upon the present issue they are. The vaporization of the cathode and the occlusion and consequent exhaustion of

the gas occur in them precisely as they do in commercial tubes. Whatever Claude's predecessors learned about these was immediately available to him and to every one else. So far as his patent depends upon the third element now critical, he must be content to accept them as directly in the art. It understood all that took place; the cathode drop, its effect upon the electrode, the resulting imprisonment of atoms of the gas, the consequent exhaustion of the gas and its final rarification to the point of non-conduction. Claude was indeed the first to suggest a practical remedy by enlarging the area of the cathode so as to increase its conductivity and reduce the drop. This has proved enough to sustain his patent, since he first produced such a light, and while it may even seem obvious to reduce the drop in his way, no one appeared before him, in spite of the success that awaited the discovery and the period during which that success could have been commanded. So to hold is not to hold that the mere notion of reducing the resistance of the cathode by any means was an invention. Claude must maintain as much, regardless of the verbal scope of his claims and their permissible expansion.

It is true, so far as we can find, that prior investigators did not expressly say that whatever reduces the resistance of the cathode will reduce the cathode drop. Claude did not say so either, since as we have shown his only mention of the drop is by allusion, as though the relation was a truism. So far as with our scanty acquaintance with the matter we may speak, we should suppose that it is, that resistance and nonconductivity and fall in potential are convertible terms; but we know nothing about it. The record does not prove that they are not and there is nothing on which to base any inference. Nor does the patent enjoy any presumption as to the matter. The examiner must indeed have thought that the claims demanded more than common-place ingenuity, or he would not have allowed them, but they were limited. We have not the slightest reason for saying that had claims been presented to him in which the phrase, "having an area of 1.5 square decimeters per ampere," was supplanted by the phrase, "having enough conductivity," he would have allowed them; at least if he had had the art before him as this record discloses it. ▆ Had he done so, the invention would have consisted in the discovery that the resistance of the cathode and the fall in potential were directly related, so that what decreased one decreased the other. We cannot say that

there was any invention in that; for aught that appears, it may be a tautology, electrically speaking. The record must prove that it was not; further, that the relation between the two was not obvious; it does not prove so. As such proof does not appear, we do not, strictly speaking, have to decide as to the comprehension of the claims at all. Even though we were to agree that they might comprehend a cæsium mirror, or any other device which decreased the resistance of the cathode, we should still be faced with the question whether the added matter so included involved invention. The plaintiff has the burden of proof on that issue and has not carried it.

Decree affirmed.

### On Petition for Rehearing.

PER CURIAM. The only question raised to which we think it necessary to refer is our statement that cæsium is an impurity deliberately introduced into the tube. Claude's French patent specifies lithium as one of the metals which may operate to purify neon, and apparently it is one of the metals which is interchangeable with cæsium to form the defendant's mirror. Machlett on the first trial said that the defendant introduced cæsium in part to purify the gas. There is therefore at least some doubt whether the statement in the opinion was not untrue. Without deciding either way, since we have not heard the appellee, the passage in question may be taken as eliminated; it was in no sense necessary to the result.