## ELECTRICAL PRODUCTS CORPORATION v. NEALE, Inc., et al.

District Court, S. D. California, Central Division.

April 3, 1931.

Report of Special Master.

To the Honorable Judges of the District Court of the United States for the Southern District of California, Southern Division:

The undersigned, David B. Head, appointed special master in the above-entitled cause, pursuant to an order of this court entered September 18, 1928, to take and hear evidence, to make conclusions as to the facts in issue, and recommend the judgment to be entered thereon, herewith submits his report:

*Action and Parties.* This is an action in equity brought by the Electrical Products Corporation, an Arizona corporation, against Neale, Inc., a Delaware corporation, and others, for infringement of letters patent No. 1,125,476, with prayer for relief by injunction and an accounting of profits and damages.

The plaintiff sues as the licensee under an exclusive territorial license to manufacture,

use, and sell the invention of the patent in suit in certain western states, including the state of California.

The original patent was issued to Georges Claude who assigned the same to Claude Neon Lights, Inc., the licensor of the plaintiff.

The master, by stipulation of the parties, set the case for the taking of testimony on October 2, 1928. At that time there appeared for the plaintiff Lyon & Lyon, by Leonard S. Lyon, Esq., and Reginald Caughey, Esq., of Los Angeles, and William Bohleber, Esq., of New York, and for the defendants, Neale, Inc., Edward G. Neale, Thomas N. Neale, and Perry H. Greer, Frank L. A. Graham, and Neil S. McCarthy, Esq., of Los Angeles, Dean S. Edmonds, Esq., of New York, and F. Eldred Boland, Esq., of San Francisco.

The testimony was taken from day to day, and on November 1, 1928, all parties rested. The testimony was taken down in shorthand by Ross Reynolds and C. W. McClain and transcribed by them in four bound volumes.

*The Issues.* The plaintiff alleges infringement by the defendants of letters patent No. 1,125,476, specifically Claim 1 thereof, by the manufacture, sale, and use of certain structures, to wit, the Schwab sign (Exhibit 33), the barber shop sign (Exhibit 32), the Balboa drug sign (Exhibit 23), the flower sign (Exhibit 24), and a sign installed in front of a theater of the defendant Boulevard Theatre Company, Inc. The defendants allege that the patent in suit is invalid for want of novelty, and that their structures do not infringe. The plaintiff has raised the issue of res adjudicata based on the decision of the Circuit Court of Appeals for the Second Circuit, in the case of Claude Neon Lights, Inc., v. E. Machlett & Son, 36 F.(2d) 574. An issue on personal liability of the defendants Edward G. Neale, Thomas N. Neale, and Perry H. Greer is raised by the evidence.

*Reserved Rulings and Amendments.* The plaintiff was permitted to amend the bill of complaint during the trial of the case to charge infringement, since the filing of the bill, by the defendants' tubes of the type of Exhibit 23.

The defendants were permitted to amend their answers to allege anticipation by the publications, Exhibits A-22, 24 and 25.

By leave granted, plaintiff was permitted to amend subsequent to trial, setting up allegations of the decree entered in the New York case, and to offer the decree. This was done December 8, 1928. The motion to amend is allowed, and the decree accepted in evidence.

A ruling was reserved on the admissibility of the Goetze catalogue, which ruling is hereinafter made under the heading "Prior Art."

All of the structures involved in this suit are electrical discharge tubes. They are designed to be used for illumination, and at the present time their most extensive use is in the field of luminous advertising signs. The phenomena of electrical discharge tubes have been studied for many years, but to a large extent the explanation of these phenomena still lies in the field of scientific hypothesis. Though these hypotheses may be valuable to physicists and represent to them a satisfactory foundation for further research, they cannot safely be made the basis for a judicial determination. However, it appears to the master that the issues raised in this suit can be determined by known and palpable facts without resort to scientific hypotheses.

It is a characteristic of gases that at low pressure they can be illuminated by the passing of an electric current through them. This is most readily accomplished by confining the gas at low pressure in a tube provided at either end with an electrode through which the electric current can pass, during which passage the rarified gas becomes a part of the electrical circuit. Through a greater portion of the tube, while the current is passing, the gas can be seen to glow with a color characteristic of the spectrum of the gas. The current passes through one electrode known as the anode, and through the gas to the other electrode known as the cathode. The use of alternating current causes each electrode to act alternately as cathode and anode. The division of space in an operating tube can be observed with the eye. Most difficult to distinguish is the cathode dark space which surrounds the cathode and is itself surrounded by a light-colored glow, well defined and easily observed, known as the negative glow. Extending from this glow a short way into the tube is another dark space which physicists have named the Faraday dark space. Extending from the end of the Faraday dark space to a point very close to the anode is the positive column. This is primarily the part of the discharge which gives the light, which in color is characteristic of the spectrum of the gas. Many factors affect the operation of the tube. Gases vary in the amount of light given off in ratio to the amount of current used. Impurities affect

different gases, especially the inactive gases, both as to color and efficiency.

All of the structures in suit are filled with neon gas, and the patent is confined in its claims to neon-filled tubes. Neon is one of the rare gases of the atmosphere discovered in 1898 by the English physicists Ramsey and Travers. It belongs to the same group as helium, argon, krypton, and xenon, which are classified as inactive gases, as distinguished from the active gases, such as oxygen, hydrogen, and others. Neon is found in the atmosphere in minute quantities, and was not generally available in commercial quantities until shortly before the patent in suit. It has a brilliant orange red spectrum and a high luminous efficiency. As observed by Claude and others, it has a low dielectric cohesion or rigidity, which means that it conducts the electric current easily. This permits the use of lower voltages with an increased factor of safety. It has a long flat pressure-voltage curve (Graph, Exhibit X, Soddy and MacKenzie, p. 105, Exhibit A–20), which means that changes in pressure in the tube will not seriously affect its operation over a broad range, as compared with the narrow efficient range of hydrogen, carbon dioxide, and other active gases. Neon shares this characteristic with other inactive gases. Neon is monatomic in structure; that is, it exists in the form of single free atoms and is considered to be chemically inert.

The sensitiveness of neon to impurities is a disadvantage in its commercial application. Certain impurities—hydrogen, for example—will mask the spectrum of neon in the tube changing the color of the discharge and greatly lowering its luminosity. This is referred to in detail in considering the Claude patent. A very serious disadvantage is the ease with which neon is imprisoned in the film deposited on the adjacent walls of the tube by the sputtering of the electrodes. During the operation of a neon-filled discharge tube small particles of electrode material leave the electrode and are deposited in a film on the walls of the electrode chamber near the electrode. This is the phenomenon referred to above as "sputtering." The occlusion of neon by the sputtered film will eventually lead to a reduction of gas pressure to a point of nonconduction. The amount of gas in the tube is dependent on the size of the tube and the pressure of the gas. It directly affects the life of the tube, in that it takes a longer time to occlude a larger quantity of gas. When a tube has been reduced to a point of nonconduction by this phenomenon, it is referred to as "plated out."

The electrode, particularly when acting as a cathode, is affected by three factors—size, material, and pressure of gas. The cathode is the metallic terminal by which the current leaves the gas and goes out of the tube without passing through any more gas.

The greatest variation in the range of potentials in the electrical circuit through a neon tube is at the cathode, that is, between the positive column and the cathode. This is known as the cathode fall or drop of potential.

Current density is an expression of current volume in relation to electrode area. Current density and cathode fall of potential bear a corollary relation to each other; each being affected in the same way by electrode area.

There is a normal cathode drop as distinguished from the abnormal. The normal range begins at a point from which a further increase in the area of the electrode causes no lowering of the cathode fall of potential, while a decrease in the electrode area causes a rise. The range below that point is in the field of abnormal cathode fall of potential. There is no doubt that this is the point at which the negative glow completely covers the cathode, though the use of an alternating current makes inaccurate the visual observation of the glow phenomenon. Cathode fall is affected by pressure; increased pressure results in a diminished cathode fall in the abnormal range. The material of which the electrode is constructed affects the amount of cathode fall. The alkaline metals, sodium, potassium, etc., have a lower cathode fall under the same circumstances than iron, copper, and metals of that type.

The pressure of the gas affects the efficiency of the tube. This is illustrated by Defendants' Exhibit X. The data plotted on this exhibit also shows that neon is not affected by pressure to the same extent as some of the other gases.

In the testimony a great many references will be found which are based on the ionic theory of electric discharges. This is a theory which is generally adopted by physicists, and it is a logical explanation of many of the phenomena exhibited by these tubes. However, it does not appear to the master that it is necessary to resort to the adoption of this theory in order to determine the is-

sues herein. The ionic theory explains electric discharges through gases by considering the atoms of the gas as being ionized by the impact of fast-moving electrons, which are attracted to the anode. The ion, which is an atom whose static electrical charge has been altered by the removal of an electron by the impact of other electrons, travels towards the cathode with great velocity. Its journey may be stopped by the addition of an electron, which brings it back to its former condition. Ions in the region of the cathode strike the cathode, knocking off electrons. This impact causes localized heating, which results in atoms of the cathode being thrown off to form the sputtered film. The atom is structurally composed of a nucleus which carries a positive charge of a certain value, around which are arranged electrons, having a fixed negative charge. When this equilibrium is disturbed, the atom gives off light. The cathode is the source of electron supply.

The ionic theory is not made a part of the findings of fact in this case. The other matters set forth above are accepted by the master as fact, while the ionic theory is rejected, first, because it is hypothesis, and, second, because it is not necessary to consider it in arriving at a determination of the issues in suit.

■ *The Claude Patent.* The Claude patent in suit was applied for November 9, 1911, and followed generally in language the French application of March 7, 1910. The specifications refer to the French patent No. 434,525, and an article by Claude in the Comptes Rendus French Academie de Sciences of May 22, 1911. The references to these two publications have been considered sufficient to permit a consideration of them as amplifying and explaining, but not supplementing, the Claude disclosure.

Claude claims: "1. (a) A luminescent tube containing previously purified neon and (b) provided with internal electrodes for illuminating said gas, said electrodes being deprived of occluded gases and (c) having an area exceeding 1.5 square decimeters per ampere, to decrease the vaporization of the electrodes and prevent the consequent formation upon the walls of the tube, in proximity to said electrodes, of deposits containing said gas, whereby the luminosity of the tube is maintained constant for a very considerable period of time without a fresh introduction of gas."

The letters are added, and represent a division of the claim into its elements. Claim 2 is the same with an added element, " * * * (electrodes) being supported without direct contact with the walls of the tube."

The specifications disclose a structure with a long tube enlarged and closed at either end. In the enlarged portions at the ends large electrodes are placed and connected with sealed in lead-in wires which make electrical contact with the source of energy. These electrodes are prevented from touching the walls of the electrode chambers by two rows of quartz beads placed around the electrode. The pressure of gas in the tube is specified as being of the nature of a millimeter of mercury. By reference to the Comptes Rendus article is found the description of one of Claude's tubes with a length of 35 meters and a diameter of 45 millimeters (114 feet by 1¾ inches) and equipped with electrodes of an area comparative with current value of 3 square decimeters per ampere. This article also refers to short tubes, 5 or 6 meters long, which require electrodes of the comparative size of 5 square decimeters per ampere.

In teaching the manufacture of the tube, three points are emphasized: (1) Removal of impurities from the gas; (2) removal of gases occluded in the electrodes; and (3) electrode size.

In understanding the emphasis placed by Claude upon the removal of impurities from the gas, it must be borne in mind that at the time Claude wrote his specifications neon gas was not readily obtainable in a commercially pure state. The preferred purification method taught is the use of a charcoal flash attached to the tube, which is immersed in liquid air to lower its temperature to a point where charcoal will readily absorb those gases which are usually found as impurities. The charcoal flash is left in operation until the last trace of impurities is absorbed; then it is sealed off and removed.

Electrode size is specified in terms of square decimeters per ampere of current, in that the minimum value of 1.5 is given and the claim of the patent so limited. Large electrode area is designated specifically for the purpose of reducing sputtering. Disappearance of the gas in the tube is explained by Claude (page 1, line 109 et seq.) as a function of the vaporization (sputtering) of the electrode: "There is, therefore, a combination of the electrode or, at all events, vigorous occlusion as regards these gases which are reputed to be inert and it is the combination which would cause the progressive disappearance of the gas. Attention having

thus been fixed to this point it has been ascertained that this combination is a function of the rapidity of the vaporization; if the surface of the electrode is sufficiently large for the heating to be small the vaporization is smaller and the disappearance of the neon is very slow and a very long life of the tube may be obtained by this method."

This, he says, "is a highly useful and unexpected discovery," and describes it at more length in his Comptes Rendus article. As before noted, the short tube described in that article had an electrode area of 5 square decimeters per ampere. "This fact can be amplified (this difficulty can be remedied) according to the present invention by the use of very large electrodes."

It is the master's understanding that Claude's teaching as to the 1.5 relationship in electrode area is to be considered as a minimum. It can be readily inferred from the Comptes Rendus article that the smaller the tube, the larger the electrode to be used.

To deprive the electrodes of their occluded gases during the formation of the tube while on the pump a current much higher than normal operating current is passed through the electrodes, heating them to a temperature sufficient to drive off their occluded gases. At the same time and in the same way the walls are cleansed of their occluded gases. The final charge of neon is then admitted, and the liquid air charcoal flask referred to above put in use, and current passed at intervals until the tube reaches its full brilliance, after which the flask is sealed off and the tube is complete and ready for use. The actual process of fabrication is described briefly by Claude (page 1, lines 45 to 59). The letters refer to the figures in the patent drawing. "The preferred operative method consists in alternating during the passage of the current exhaustion by means of the vacuum pump c and the admissions of neon at d until the tubes have been appropriately scavenged; the pump c is then cut off and the desired charge of neon is admitted to the tube; the carbon receptacle b is then immersed in the liquid air e in continuing to cause the current to pass at intervals until the last detrimental traces of foreign gases are absorbed and the tube not only acquires its full brilliancy but retains it indefinitely. The lamp is then separated from the carbon receptacle b and the tube is ready."

The scavenging referred to above is descriptive of the washing out of impurities by successive admission and exhaustion of gas during formation.

*The plaintiff's commercial product* is a tube provided with large copper electrodes. The tube is processed on a rack provided with a source of high potential current, a vacuum pump, two charcoal liquid air purifiers, and a means of supplying neon gas to a determined pressure. The tube is provided with a tubulation which is sealed to the apparatus to which the vacuum pump is attached. The pump is turned on, and, as the pressure decreases, a heavy current is passed through the tube until the electrodes are heated to a cherry red. A charcoal container in connection with the tube is immersed in liquid air to further reduce the pressure and absorb impurities. The copper electrodes are of large area, in the neighborhood of 20 square decimeters per ampere. After this operation the tube is permitted to cool, and neon is admitted to a pressure of $7\frac{1}{2}$ millimeters of mercury. The neon passes through the other charcoal liquid air purifier before reaching the tube. The tube is sealed off and placed on another rack to burn on regular operating current until the last trace of impurities has disappeared. The tube is then considered to be complete and ready for installation. It is designed to operate on an alternating current of 25 milliamperes.

*The New York Case.* The term "New York Case," as found in the transcript, refers to the case of Claude Neon Lights, Inc., v. E. Machlett & Son, 21 F.(2d) 846, in the District Court for the Eastern District of New York and the Circuit Court of Appeals for the Second Circuit, 27 F.(2d) 702, 704. The transcript of the record and the opinion of the Circuit Court of Appeals is in evidence as Plaintiff's Exhibit 40. The decision in this case is urged by the plaintiff herein as res adjudicata and as persuasive in its effect upon the issues herein in the event it does not have the standing of res adjudicata. The issues in that case were: (1) Validity of the same Claude patent here in suit; and (2) infringement by the Chevrolet sign, which was similar to the Balboa drug sign (Exhibit 23) in the instant case. The trial judge therein held that the patent was valid but restricted in scope to a tube using neon purified by the particular process described therein and to electrodes deprived of their occluded gases by heating to a comparatively high temperature, 900 to 1000 degrees centigrade. He found that the specification of the relation in $\dfrac{\text{electrode area}}{\text{current}}$ of 1.5 square decimeters per ampere to be a true critical point and as such a part of the invention. He held

the Chevrolet sign not to infringe because in its manufacture no purification of neon took place during formation, and, further, the electrodes had not been heated above 200 degrees centigrade. The Circuit Court of Appeals, in reversing the lower court, held that the electrodes on the Chevrolet sign were deprived of their occluded gases within the scope of the patent although not heated to a temperature of over 200 degrees centigrade, and that the tube contained "previously purified neon," as claimed by Claude, in that "the neon becomes, as referred to, previously purified, no matter what process has been used." The Chevrolet sign had been "aged," that is, had been run until the impurities disappeared, which is a characteristic of neon tubes containing slight traces of impurities.

"But we think that the claims referred to neon after it has been purified in the tube and the tube is ready for use. The neon becomes, as referred to, previously purified, no matter what process has been used." Opinion of Manton, Circuit Judge, page 704 of 27 F.(2d)

The court considered that neon containing 15 per cent. of helium was previously purified neon, in that the presence of that quantity of helium did not affect the characteristic color of the gas. In that suit the prior art considered included all the prior art herein cited, except the two Fleming patents (Exhibits A–3 and A–4). The iron button, caesium mirror type of tube manufactured by the defendant herein was in evidence, not as an infringed type but as a defendant's exhibit, relied upon by them to disprove the so-called "Claude rule of relationship." The Circuit Court of Appeals held that it failed to do this, and said: "The argument that the button-caesium or caesium-mirror electrode proved that the patentee's rules of relationship of surface area to current used plays no part in the life of the tube, is also unsound. Machlett's testimony is a refutation of this claim. The caesium plays a part which is equivalent to additional surface area of the electrodes. It is equivalent to additional electrodes. The button electrode is always and only used with caesium. Without the caesium the button electrode would destroy itself before complete formation of the neon tube. Machlett admits that the caesium has an effect on the cathode drop. The appellee has not proven that the button electrode with caesium is equivalent to an electrode of the same area without caesium. It does not establish the inventor's rule to be erroneous" Opinion of Manton, Circuit Judge, page 706 of 27 F.(2d).

The above language is relied upon by the plaintiff as an adjudication in that suit that the iron button caesium mirror type of tube is equivalent to the Claude combination in the sense that it constitutes an infringement. If this statement means that the court considered the iron button caesium mirror type to be an infringement of the Claude patent, it is dicta. However, in that case the validity of the patent was attacked on the ground that the Claude rule of relationship was not valid, and the iron button caesium mirror type of tube was relied upon by the defendants as proving their contention. It is only logical to assume that the Circuit Court of Appeals, in the use of the language quoted above, was making a finding upon the issues and not expressing an opinion upon infringement by a structure that was not in issue. In a decision rendered March 12, 1929 [31 F.(2d) 989],[1] on a motion for a supplementary injunction after decree on mandate in the New York case, Judge Campbell held that the above finding of the Circuit Court of Appeals was res adjudicata in that action and determinative of the issue of infringement raised by the motion. "That question was determined by the Circuit Court of Appeals adversely to the defendants, because if the caesium was not the equivalent of electrode area, then the Claude rule would have been established to be erroneous, and the patent would not have been held to be valid, as the iron button itself had an area of about .7 square decimeters per ampere, instead of at least 1.5 square decimeters per ampere, as did the electrode in the patent" (page 990 of 31 F.(2d), opinion of Campbell, District Judge).

The master is unable to agree with this holding of res adjudicata and with the finding of the Circuit Court of Appeals if it is a finding determinative of infringement.

The issues presented in the instant case on validity and infringement by the drug sign (Plaintiff's Exhibit 23) are the same as the issues in the New York case. The evidence as to validity is practically the same in the two cases except as to the correctness and interpretation of the $\frac{\text{electrode area}}{\text{current}}$ relationship. The evidence on infringement by the magnesium carbonate type of tube is the same, except that herein the defendants deny passing a heavy current through the electrodes during manufacture. The finding herein made by the master is that current was passed in manufacturing the drug sign,

[1] Opinion withdrawn by the court. See 33 F.(2d) 300.

which corresponds to the finding in the New York case.

The iron button caesium mirror type of tube is herein in evidence as an infringing device. A third type, the so-called high pressure tube, is in evidence, Exhibit R, offered by the defendants as disproving the "Claude rule of relationship." This type was not in the New York case; the iron button caesium mirror type occupying the same place in that case.

*The New York Case. Res Adjudicata and Estoppel.* The master finds that the only relationship between the party defendants in the New York case, E. Machlett & Son and Rainbow Lights, Inc., and the defendant Neale, Inc., herein is that a licensor and licensee under patents not in issue, and, further, that the plaintiff has not proven that the control and direction of this action is in the hands of Rainbow Lights, Inc., or any person other than the defendants. The defendants herein and Rainbow Lights, Inc., are not in privity as to any matter in issue in either case. Their contractual relations are connected with patents not in suit, nor is there any contention that Neale, Inc., controlled or directed the New York Case. Bigelow v. Old Dominion Company, 225 U. S. 126, 32 S. Ct. 641, 56 L. Ed. 1009, Ann. Cas. 1913E, 875. Confusion has arisen between the situation wherein the defendant has assumed control of the prior case and the contention here that the defendant in the prior case has assumed the control and direction of the second case.

The exaggerated and misleading statement of defendants Neale, Inc., in advertisements (Plaintiff's Exhibits 59, 60 and 61) lack all of the elements but one necessary to create an estoppel.

The statement by Mr. Darby (Record, New York case, p. 1151) in requesting a stipulation does not amount to an admission that there is an identity of parties in the respective cases. If this case had proceeded to decree prior to the determination of the New York case, and the licensors had participated in this case, a different situation would have been presented, and Mr. Darby's statement must be read with this in mind.

The defendants are not estopped from contesting the issues herein which are identical with the New York case, nor is the decree in that case res adjudicata as between any of the parties to this action. The decision in the New York case may be considered as persuasive.

The findings hereinafter made by the master were arrived at independently. While based upon different evidence and reached by different reasoning, the findings first expressed in the master's draft report reached the same conclusions on common issues as found in the New York case. Upon reading Judge Campbell's decision on the button electrode caesium mirror infringement issue [21 F.(2d) 846], the master has again reviewed his findings bearing on this issue, in an effort to reconcile the variance. This he is unable to do. It should be noted that the evidence on infringement in this case is more complete and exhaustive than the evidence on the same structure on the issue of validity in the New York case. The high pressure tube (Exhibit R) is hereafter held not to prove the Claude patent invalid. In reaching that conclusion, the master has considered the high pressure tube only in its relation to the scientific facts to be found, and has not given thought to any possible infringement by that tube. The high pressure tube bears the same relationship to this action as the iron button caesium mirror tube bore to the New York case.

*The French Experts' Report.* The report of a board of experts appointed by the French court having original jurisdiction over a case involving, among other issues, the validity of the French patent corresponding to the patent here in suit, was received in evidence by consent as Plaintiff's Exhibit 39. Due to the difficulty in determining the issues and evidence considered by the French experts, their report is of little persuasive value, except that it contains an excellent and careful consideration and examination of the state of the art, covering practically the same field as the prior art references considered herein.

*Prior Art.* The prior art may be divided into two classes: (1) Scientific publications by physicists; and (2) structures of practical workers in the field. In the first group are: Thompson's Conduction of Electricity through Gases (Exhibit A–25); Travers' Experimental Study of Gases (Exhibit A–24); Soddy and MacKenzie's The Electrical Discharges in Monatomic Gases (Exhibit A–20); Baly's The Spectra of Neon, Krypton, and Xenon (Exhibit A–18); Campbell Swinton's Occlusion of the Residual Gas by the Glass Walls of Vacuum Tubes (Exhibit A–21).

An examination of these works indicates that they were written by physicists who were studying the physical phenomena of

electrical discharges and the properties of gases, and who were not concerned with the commercial building of illuminating devices. The scientific data discovered and collected by these writers would have been and are of considerable value to any one attempting to construct a commercial neon tube. Claude's statement that his observation of the function of the sputtered film was "an unexpected discovery". indicates that he was not familiar with the publications mentioned above.

The tubes with which Baly, Soddy and MacKenzie, and Travers were concerned were small spectral tubes used in illuminating gases in order to study their spectra. They were 5 or 6 inches long, with small electrodes and a capillary central portion. They operated on small currents, and became warm during operation due to the restriction in the capillary. The capillary phenomenon referred to in the testimony of the experts is observed to be due to a tendency of the impurities in the gas in spectral tubes to remain near the electrodes, which permits the gas in the capillary to glow with a fairly clear spectrum. Judge Campbell in the New York Case was unable to observe the capillary phenomenon, while the French experts in their report find that there is such a phenomenon. The master's view agrees with that of the French experts.

Thompson in his book, the last edition of which was published in 1906 (Exhibit A–25), summarizes the work of others in studying cathode drop of potential. He explains the transition from normal to abnormal range of cathode drop and the effect of pressure upon the disintegration of the cathode.

Travers, one of the discoverers of neon, discussing the preparation of spectral tubes, observed that gases are absorbed by the sputtered film. His instructions included the use of a discharge of current to purify the tubes and cleanse the electrodes of their occluded gases.

Soddy and MacKenzie, in preparing spectral tubes for filling with monatomic gases, helium, neon, etc., ran a heavy discharge between the electrodes to free them from occluded gases. They plotted the pressure-voltage curve of argon and helium and observed generally the curves of the inert gases as compared with the sharp curves of the active gases.

Baly, an authority on spectroscopy, in preparing spectral tubes for the study of inert gases, observed the occlusion of gases by the sputtered film. He explained a method of purifying tubes and electrodes by the passing of current to drive out occluded gases and the scavenging of tubes by successive inductions of gas.

Campbell Swinton suggested occlusion by the sputtered film as an explanation of gas depletion which was later verified by Baly, Travers, and Claude.

The above group, singly or as a whole, do not teach the manufacture of commercial neon tubes. They do teach the purification of spectral tubes and electrodes and observe the effect of the sputtered film on the life of the tube. Much of the data referred to would be helpful to the commercial worker, but he would have to go far beyond their teaching to build a neon tube as we know it. Spectral tubes cannot be definitely classified as analogous or nonanalogous art. In many respects the problems are the same, but they differ in degree. Workers with spectral tubes did not demand a life of more than fifty hours. They could tolerate impurities in the gases. None considered electrode area as related to sputtering. While they recognized and worked out to their satisfaction the same problems which affect commercial workers, they did not carry their work beyond their own needs.

*The Goetze Catalogue.* A ruling was reserved on the standing of the Goetze catalogue as a prior publication. The evidence shows that the Goetze catalogue and price lists were printed and distributed to prospective customers, in a proven instance, to Biddle, a dealer in laboratory equipment. They were printed in German. The paucity of evidence of circulation and knowledge of these publications inferentially negatives the claim made for them. The master rejects the Goetze documents as not constituting prior publications, and so rules on the question reserved.

Inasmuch as this ruling is contrary to the ruling on the same issue in the New York case, the Goetze catalogue and price lists will be discussed, particularly the 1907 price list and the structure on page 12 thereof, designated as "Type C." The descriptive matter shows that the large electrodes are used to reduce sputtering. The size is not specified, but the cut on page 12 indicates that they are very large as compared with the size of the tube. Nothing is said of freeing the electrodes of impurities. It would appear doubtful that this could be done by passing a heavy current, in that the capillary portion would not carry a current heavy enough to drive off gases from such a large electrode. In not specifying this ele-

ment, the Goetze price list of 1907 does not constitute an anticipation, if it were to be given the standing of a prior publication. It being a publication foreign both to the country of the first application and this country, the strict rules of construction applied to such publications would eliminate it from consideration. It teaches but one of Claude's three elements.

The Nutting paper, "The Luminous Properties of Electrically Conducting Helium Gas" (Defendants' Exhibit A–10), describes the work of Dr. Nutting at the Bureau of Standards in making helium tubes for use as a photometric standard. These were short tubes with large electrode chambers connected by a capillary portion 50 millimeters long and of a 2 millimeter internal diameter filled with helium to a pressure of 5 millimeters of mercury. Nutting passed a heavy current while pumping the tube to free the interior walls and electrodes of hydrogen. The tube was successively filled with gas and exhausted before the final charge was admitted. Nutting states that his tubes had a life of fifty hours. In his second paper (Plaintiff's Exhibit 57) he says that about half of his tubes showed hydrogen when first started. His electrodes were above the Claude minimum, but he apparently had no interest in the problem of sputtering. His short life of fifty hours leads to the conclusion that he was either not employing all the elements of Claude or that helium tubes are not analogous art.

The Cooper Hewitt patents, Exhibits A–7 and A–8, do not disclose a practical operative device. They are prophetic in mentioning neon as a gas suitable for illumination in a discharge tube. Cooper Hewitt was attempting to find a means of correcting the undesirable color of his mercury tube lamps.

The Moore patents, Exhibits A–13 and A–18, describe the nearest approach to Claude in the commercial field. Moore's tube in its day was a commercially successful product. The tube was very large and filled with an active gas, usually nitrogen or carbon dioxide, at a pressure of a tenth of a millimeter of mercury, provided with electrodes large enough to avoid fusion, and operated on currents of high potential. The active gas in the tube disappeared so rapidly that Moore found it necessary to introduce fresh charges of gas several times a second. This he accomplished by an ingenious valve arrangement. In this way he avoided any problem of sputtering, being satisfied with an electrode that would avoid fusion, and protect the seal at the lead-in wires. Active gases are not seriously affected by impurities; consequently impurities in the gas and electrodes did not bother Moore. While the Moore tube at first glance appears closely to approach the Claude tube, on examination it is found to embody none of the elements, the combination of which Claude claims as his invention.

Other prior art patents are in evidence which are ignored in defendants' briefs. There is nothing in these patents that is not found in the prior art discussed above.

The prior art can be summed up as teaching: (1) The driving off of occluded gases by use of a heavy discharge; (2) scavenging of tubes by successive introductions of gas; (3) that depletion of gas is a function of the phenomenon of sputtering (and, if Goetze is considered, that large electrodes decrease sputtering); and (4) that electrical discharge tubes can be applied to commercial uses (Moore).

No prior art patent nor publication teaches the manufacture of a commercial operative neon tube. As to the phenomenon of sputtering, the prior art points out the evil of some of the data on electrode fall and electrode material point in the direction of its solution.

### Claim 1 of the Claude Patent.

(a) *Previously Purified Neon.* The master finds that this is intended and does claim neon in a completed tube ready for use, regardless of how its purity was obtained. At the time Claude specified the purification process "on the spot" neon was not obtainable in quantity in a commercially pure form as it is now. His specifications would not have been complete unless he had described a process of manufacture that would have at that time resulted in a commercial product. The inclusion in his claim of previously purified neon as one element does not reserve to him any monopoly of the physical characteristics of neon gas. If, at the time Claude wrote, neon gas had been readily obtainable in commercially pure form, it would not have been necessary for Claude to specify a purification process, and, if he had not, the claim would still be valid as it reads.

(b) *Electrodes Deprived of Their Occluded Gases.* In view of the work of Nutting, Travers, Soddy and MacKenzie, and Baly, the driving off of occluded gases from the electrodes by heating them by passing a heavy current through them was not new in the art of manufacturing electrical discharge tubes generally. Here it must be borne in

mind that the work of these men, particularly those other than Nutting, was in the preparation of small spectral tubes. Some doubt can be expressed as to whether a sufficient current could be passed through the capillary of the spectral tube without fusion to thoroughly cleanse large electrodes. Nutting was also working with tubes having a very small central portion. However, a worker in the art, manufacturing a commercial neon tube, could have learned a technique satisfactory in accomplishing the result desired by referring to the work of the men above mentioned.

(c) *Electrodes Having an Area Exceeding 1.5 Square Decimeters per Ampere.* A large amount of evidence was offered on the subject of Claude's expression of the $\frac{\text{electrode area}}{\text{current}}$ relationship, referred to as the "Claude rule of relationship." For the reasons hereinafter given, the master rejects the phrase "Claude rule of relationship" as inaccurate and not descriptive. In the New York case, the trial court and the appellate court found that the minimum value of 1.5 square decimeters per ampere was definitive of the critical point, and Judge Campbell particularly connected the glow phenomenon with the so-called "rule of relationship" as indicative of transition from normal to abnormal cathode drop. On such a finding the 1.5 square decimeters per ampere expression is a true rule of relationship which, if first in the art, would represent a discovery of great scientific and practical value.

Judge Campbell made this finding upon the showing in the curve, Plaintiff's Exhibit 12, and he rejects the iron button caesium mirror type as not disproving the plaintiff's showing. In the instant case the evidence on this point is extensive and varies considerably from the evidence offered in the New York case. The master comes to the conclusion that in any tube described by Claude or manufactured either by the plaintiff or defendants (except the high pressure type) the critical point in $\frac{\text{electrode area}}{\text{current}}$ occurs far above 1.5 square decimeters per ampere.

A reading of the Claude patent does not disclose any expression of the inventor that the 1.5 square decimeters per ampere relation is considered as anything more than a practical limit, a warning. Its introduction in the Claude claims is a limitation. If the disclosures of the patent would entitle Claude to protection in a small area, it amounts to a dedication. The Claude specifications, as amplified by the Comptes Rendus article, recognize the propriety of working in the larger areas except where a yellowish light is preferred. The Comptes Rendus article demonstrates that Claude recognized that the electrode area was directly connected with the life of the tube. The master understands Claude as teaching the use of large electrodes, and that these electrodes should be made as large as possible within practical limits, and that the smaller areas should not be used unless the manufacturer is willing to sacrifice long life to obtain a change in color which results from the use of higher current densities, and that in no case should electrodes of an area of less than 1.5 square decimeters per ampere be used, because the experiments of the patentee had demonstrated that that is an absolute minimum for commercial tubes. Plaintiff's Exhibit 12 shows no critical point at or near 1.5 square decimeters per ampere. This exhibit must be understood as expressing the relationship between voltage and current in terms of the reciprocal of square decimeters per ampere and volts. This results in the introduction of a constant into the calculations. Plotted without the introduction of a constant, the curve would very closely approach a straight line on both sides of the 1.5 point. The introduction of a constant changes the straight line into a hyperbola. Plaintiff's Exhibit 12 does show that the 1.5 area is located in a region where electrode drop is increasing rapidly. Beck's life tests, graphed as Defendants' Exhibit K, illustrates the corresponding effect on life by changes in electrode area relationship. In the commercial tubes having the elements of the Claude patent, the critical point in $\frac{\text{electrode area}}{\text{current}}$ relationship lies somewhere above 10 square decimeters per ampere.

The point has been raised that Claude did not consider the effect of pressure on current density in fixing the size of electrodes. The master finds that Claude is not restricted by the expression of the pressure of the nature of a millimeter to that particular pressure, but is entitled to that range of pressure in which his combination of elements will operate efficiently. His experiments with large and small tubes show the effect of the amount of gas in the tube on life. The worker in the art to whom the Claude patent speaks is not the glass-blower nor the pumpman, but the trained technician or electrical engineer directing the work in this highly specialized field. Such a person would readily perceive that the amount of gas in the tube could be

increased by increasing the pressure as well as by increasing the volume of the tube. Claude's combination of elements will function at any pressure within the flat range of the pressure-voltage curve for neon. This is shown on Defendants' Exhibit X, as extending from about 2 millimeters to beyond 27 millimeters. The high-pressure tube in this case has no weight in disproving the practical value of the Claude minimum. In a high-pressure tube efficiency is somewhat sacrificed to reduce electrode area. Although Claude's tube would probably operate at a pressure of 24 millimeters, he did not contemplate the use of such high pressure when he made his minimum specification, and it is doubtful whether a tube of such pressure would ever have been manufactured commercially had it not been for Claude's expression of that limitation. Defendants' argument that the commercial tubes of the plaintiff employ an electrode area in excess of the minimum value specified by Claude and that Claude selected a minimum which was below that which ordinarily would be adopted, does not detract from his teaching as to the function of electrode area as one element in giving long life to commercial neon tubes. Claude was claiming as low a minimum as he logically could in order to obtain a broad scope for his claim. The 1.5 point is not unreasonably low.

In the prior art references, no clear solution is given for problems of sputtering, although the phenomenon itself was observed and defined. The Claude specifications in respect to electrode area represent a new contribution to the art.

General Electric v. Cooper Hewitt Company (C. C. A.) 249 F. 69, and other cases cited by defendants are not in point. Therein the claims of invention rested solely upon the discovery of a critical point and its functional relation to a process or structure. Herein the 1.5 figure is given as a minimum in determining the size of one element of a combination. The patent directs the worker to go above that point, not to make use of it. The 1.5 relation stands as a limit below which Claude cannot claim protection. Although the point was arbitrarily selected, he is entitled to protection in the range above that point, in that his selection of that point is not unreasonable.

The master concludes that the Claude patent is valid. It does not rise to the standing of a basic patent, in that much pioneer work in the field of electrical discharge tubes had previously been done by the English group, Thompson, Baly, Travers, and others, and the Americans, Moore and Nutting. Claude's work resulted in a combination which included a new contribution on electrode area, that resulted in a structure capable of commercial competition with other systems of illumination. The only previous commercial tubes, those of Moore, had been driven out of use by the more efficient and cheaper incandescent lamp. Claude brought the electrical discharge tube back into standing as a commercial art. In this he made an important and meritorious contribution to the art, which is entitled to high standing as an invention.

*Defendants' Magnesium Carbonate Electrode Type Tube.* The defendants' structures which are alleged to infringe are of two types. They are similar to each other except in electrode structure and the means used to reduce sputtering. The first of these to be considered is the tube referred to in the testimony as the magnesium carbonate tube. The manufacture of one of these tubes was observed at the defendants' Neale, Inc., plant. The tube was placed on a rack and attached to a vacuum pump equipped with a McLeod gauge, a liquid air trap between the pump and the tube, and a potassium and sodium arc through which the gas passed before entering the tube. The rack and tube were placed in an oven which was turned on and heated to 890 degrees Fahrenheit. During this time the pump was turned on. After heating, the tube was permitted to cool, the pump turned off, and the tube filled with neon gas to a pressure of 10 millimeters of mercury on the McLeod gauge. When placed on a current of 25 millimeters, the tube showed a color similar to that of neon, but with a distinct pinkish cast. Evidence was introduced by the plaintiff in the testimony of former employees of the defendants to the effect that magnesium carbonate tubes, and particularly Plaintiff's Exhibit 23, were manufactured by a process which included the passing of a heavy current through the electrodes before the oven was turned on, and that the tubes were later put on a rack and allowed to "age" by burning a normal operating current. The master concludes that the drug sign, Exhibit 23, was manufactured by heating the electrodes with a heavy current.

Electrodes of this type are carbon cylinders, the inner bore of which is filled with a quantity of magnesium carbonate which, during the formation of the tube, dissociates and releases carbon dioxide. The defendants contend that carbon dioxide remains in the finished tube. It is immaterial whether it does or not. The electrodes of Exhibit 23 have

an area relative to current of approximately 7 square decimeters per ampere when operating on a current of 32 milliamperes.

*Infringement by Drug Sign, Exhibit 23.* When found in operation, the tube contained neon that had been previously purified. The electrodes had been deprived of their occluded gases. The temperature to which they were heated is not material. It is sufficient that they were heated to a temperature high enough to deprive them of their occluded gases. The electrodes are of a relative area in excess of 1.5 square decimeters per ampere. This is a combination the same as that claimed by Claude, and it functions in the same way to produce long life of a neon tube. If carbon dioxide is present as a fourth element, it does not change the function of the combination of three elements.

The master concludes that the drug sign, Exhibit 23, infringes claim 1 of the Claude patent.

*The Iron Button Caesium Mirror Type Tube.* The other type of tube manufactured by defendants Neale, Inc., and alleged to infringe, is known as the iron button caesium mirror type. The barber shop sign, in evidence as Exhibit 32, the flower sign, Exhibit 24, and the Schwab sign, Exhibit 33, are of this type. Exhibits 20 and 21 are electrodes from the barber shop sign, Exhibit 33–A is an electrode from Exhibit 33, and Exhibit 24–B is an electrode from Exhibit 24.

The manufacture of a tube of the iron button caesium mirror type was demonstrated at defendants' plant. The tube was placed on a rack in an oven. Three tubulations extended from the tube to the exterior of the oven, one to the pump and two from the electrode chamber to a point slightly outside of the oven. In the last two tubulations small pellets of caesium were deposited, the pump was turned on, the current passed between the electrodes until they were heated to redness, the current turned off, the oven closed and lighted. The oven was then heated for some ten to fifteen minutes, the pump turned off, and a quantity of caesium distilled into the tube while the tube was still hot. The current was passed momentarily through the tube, and the discharge showed the spectrum of caesium. The pump was turned on and after a few minutes turned off and the tube allowed to cool. The remaining caesium was then distilled into the electrode chambers through the tubulations where it formed a mirrorlike deposit on the walls of the electrode chamber near the electrode. The tube was filled with

neon to a pressure of 10 millimeters of mercury just before the caesium was distilled from the final tubulation to the electrode chamber. This process was practically the same as that described by plaintiff's witnesses, with the exception that some evidence was offered to the effect that neon was not admitted until after the caesium mirror had been distilled into the electrode chamber. The defendants' tubes are generally 10 to 12 feet in length with a diameter of fifteen millimeters and filled to a pressure of 10 millimeters of mercury or somewhat less, and operating on a current of 20 to 30 milliamperes. The electrodes of the Schwab sign, Exhibit 33, and the flower sign, Exhibit 32, are admittedly of an area less than 1.5 square decimeters per ampere. The electrode from the barber shop sign, Exhibit 20, has an area relative to an 18 milliampere current of between 2 and 3 square decimeters per ampere.

*Infringement of the Iron Button Caesium Mirror Type.* This tube, the manufacture of which is described above, differs from other tubes in that iron electrodes of an area less than 1.5 square decimeters per ampere are used, and caesium is intentionally introduced into the tube. Caesium at the pressure and temperature at which the tube operates forms a vapor near the electrode. This can be determined spectroscopically, and it can be inferred that particles of caesium are at times deposited on the electrode, quartz sleeve, etc. Caesium is an alkali metal. If it were possible to make an electrode of caesium, it would have a much lower fall of potential than iron, copper, and metals of that class.

It has been established by the defendants' evidence and the master finds that the caesium mirror is not in electrical contact with the iron button electrodes during the normal operation of the tube.

The Claude claim in suit does not read directly on the iron button caesium mirror tube. The plaintiff urges the contention that, under the doctrine of equivalents, infringement is evident. Undoubtedly, the Claude patent is entitled to a fairly broad range of equivalents. The defendants' tube contains previously purified neon, and its electrodes are deprived of their occluded gases. The question of equivalency arises on the third element of the combination, and may be stated thus: Is a tube filled with neon gas, using electrodes of an area less than 1.5 square decimeters per ampere and containing the metal caesium deposited near the electrode, but not in electrical contact therewith, equivalent to a tube filled with the same gas having an area in ex-

cess of 1.5 square decimeters per ampere, but containing no caesium, in the sense that it performs the same function in substantially the same way? The function of both is to reduce sputtering. The use of a large electrode lowers the current density, and the lowering of current density is accompanied by a reduction of cathode drop. Claude's large electrode lowers the cathode drop to a point where sputtering and gas depletion are greatly reduced, with longer life resulting. The defendants' tube with small electrodes and caesium takes advantage of the fact that electrical conduction from the mixture of caesium vapor and neon near the cathode to the cathode is accomplished with greater ease and smaller loss of potential (cathode drop) than from pure neon to the cathode. The reduction of the drop of potential and the resulting decrease of sputtering is a function of the mixture of neon and caesium and not of electrode area. This is evident from the fact, which the patent admits, that a neon tube with electrodes of an area less than 1.5 square decimeters per ampere without caesium would not operate successfully.

Beck's life tests with the plaintiff's type of tubes with caesium and without indicate that caesium does not function the same as large electrode area. His tests were made with tubes with very large electrodes operating well within the normal range of cathode drop. The tube containing caesium had a longer life, which implies that the cathode fall was reduced to a point below that which can be reached by increasing electrode area.

Looking to the specifications, it is evident that Claude directed his inventive skill entirely to the reduction of sputtering by increasing electrode area. There is nothing in the patent that would lead any one to adopt other means of accomplishing this result. His specific and emphatic direction that all traces of impurities should be removed from the gas, tube, and electrodes would deter the worker from introducing caesium into the tube. This does not mean that Claude is precluded from invoking the doctrine of equivalents, but that the defendants' tube is not an obvious nor colorable copy of Claude's structure.

The effect of cathode drop upon the phenomenon of sputtering and occlusion of gas by the sputtered film was known before Claude's invention and the combination which he claimed solved the problem. He distinctly claimed that combination. His work does not preclude others from attacking the problem in a different way, even though it is done with the deliberate intention of avoiding the

scope of his claims. Keystone Bridge Co. v. Phoenix Iron Co., 92 U. S. 274, 24 L. Ed. 344; Lehigh Valley Railroad Co. v. Mellon, 104 U. S. 112, 26 L. Ed. 639; McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800; Wilson & Willard Mfg. Co. v. Union Tool Co. (C. C. A.) 249 F. 729.

The prior art tubes used all the elements of Claude's tube except the large electrode. While Claude believed that he had made a distinct contribution in observing the cause of gas depletion, it has been shown that his contribution was limited to a means of reducing sputtering; i. e., large electrodes. The iron button caesium mirror type uses all of the elements of the prior art, including small electrodes, but adds the vapor of caesium which reduces sputtering. Claude changed one prior art element, the electrode, obtaining easier conduction from the electrode to the gas; the defendants changed another prior art element, the gas in the vicinity of the electrode, and obtained the same result.

To hold that the iron button caesium mirror tube is a combination equivalent to Claude would be to say, in effect, that any combination that reduces depletion of gas by the sputtered film is an equivalent. To hold that the Claude patent has such a scope would be to extend the protection of that patent to cover function, and function is not patentable. Westinghouse v. Boyden, 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136. Claim 1 of the patent is directed to a structure, one element of which is an electrode of a specific minimum size. The claim cannot be interpreted to include the function of that electrode.

From the above the master concludes that the iron button caesium mirror tubes, Plaintiff's Exhibits 24 and 33, do not infringe claim 1 of the Claude patent.

The barber shop sign, Exhibit 32, with electrode, Exhibit 20, contains neon previously purified, electrodes deprived of their occluded gases, and one electrode of an area of 1.5 square decimeters per ampere. The master concludes that the barber shop sign infringes claim 1 of the Claude patent.

■ *Liability of Individual Defendants.* The evidence shows that Perry H. Greer was and is a creditor of Neale, Inc., by reason of loans made by him to the corporation, and that he advised the defendants Edward G. Neale and Thomas N. Neale on questions involving the management of their business. This state of facts does not support the con-

tention that the defendant Greer is liable for the acts of defendant Neale, Inc.

If the Adohr Creamery signs are infringing structures, the defendant Greer is liable in damages for their sale and use. Reliance Construction Co. v. Hassam Paving Co. (C. C. A.) 248 F. 701. It does not appear that he, as an individual, purchased or used any of the defendant's Neale, Inc., signs. The question of infringement by the Adohr signs can be determined later on accounting.

The defendants Edward G. Neale and Thomas N. Neale are individually liable for the acts of Neale, Inc., by reason of their control and direction of the corporation's business and their ownership of practically all of the capital stock of the corporation.

The type of sign installed and used by the Boulevard Theatre Company, Inc., has not been determined, and this determination can be made when an accounting is had.

Summary of Conclusions.

The master finds:

(1) That the plaintiff, Electrical Products Corporation, is licensed by Claude Neon Lights, Inc., exclusively to manufacture, use, and sell, under letters patent No. 1,125,476, in the states of California, Oregon, Washington, Montana, Idaho, Nevada, Arizona, New Mexico, Colorado, Wyoming, Utah, and in the city of El Paso, Tex., and the Hawaiian and Philippine Islands;

(2) That title to letters patent No. 1,125,476 is vested in Claude Neon Lights, Inc.;

(3) That said letters patent, and particularly claim 1 thereof, are good and valid in law;

(4) That the drug sign, Exhibit 23, and the barber shop sign, Exhibits 20, 21, and 32, were manufactured and sold by the defendant Neale, Inc., and infringe the aforesaid letters patent and particularly claim 1 thereof;

(5) That the signs, Schwab, Exhibit 33, and flower, Exhibit 24, do not infringe the aforesaid letters patent;

(6) That the defendant Perry H. Greer is not liable for the acts of the defendant Neale, Inc., in manufacturing and selling the infringing signs;

(7) That the liability of the defendant Perry H. Greer in connection with the sale and use of certain signs by the Adohr Creamery Company should properly be considered on the accounting of profits and damages;

(8) That the defendants Edward G. Neale and Thomas N. Neale are individually liable for the infringing acts of the defendant Neale, Inc.; and

(9) That the liability of the defendant Boulevard Theatre Company, Inc., should properly be considered on the accounting of profits and damages.

Recommendations.

That a decree be entered in conformity with this report, and an injunction issued restraining the defendants Neale, Inc., Edward G. Neale, and Thomas N. Neale, from the acts herein found to infringe the letters patent in suit, and that an order be entered directing an accounting of profits and damages, and that each party bear its own costs.

This report was submitted to counsel in the form of a draft, and exceptions to the draft were submitted. In response to these exceptions certain amendments in the interest of clarity have been made. The exceptions of both parties are overruled.

Herewith the original file in the case is returned together with the transcript of testimony, exhibits, briefs, and other papers filed with the master.

Respectfully submitted,

David B. Head,
Special Master.

Los Angeles, California.
April 1, 1929.

Lyon & Lyon, of Los Angeles, Cal. (William Bohleber, of New York City, Leonard S. Lyon and Reginald E. Caughey, both of Los Angeles, Cal., and Edwin J. Prindle, of New York City, of counsel), for plaintiff.

Frank L. A. Graham, of Los Angeles, Cal. (Dean S. Edmonds, of New York City, F. Eldred Boland, of San Francisco, Cal., and Neil McCarthy, of Los Angeles, Cal., of counsel), for defendants.

COSGRAVE, District Judge.

After a review of the report of the special master, I find myself in agreement with findings 1, 2, 3, 4, 6, 7, 8, and 9.

With respect to finding 5, I am impressed with the view that the subject of litigation is a pioneer patent, and, such being the case, the doctrine of equivalents should be given a wider scope than the special master has accorded it. Under this view, Exhibits 33 and 24 should be held to infringe.

The evidence might well have supported a finding that defendant Perry H. Greer actively participated in the infringing acts of Neale, Inc., and should be held accordingly,

838

but, since the Master's finding is to the contrary, it cannot be said that such finding is unsupported by the evidence.

Plaintiff is entitled to its costs.

Plaintiff will present appropriate findings and decree.